

**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA**

| | | |
|---|---|---|
| SEALED | : | **FILED UNDER SEAL PURSUANT TO** |
| | : | **31 U.S.C. § 3730(b)(2)** |
| Plaintiffs, | : | |
| | : | CIVIL ACTION NO.  2:20-cv-0732 |
| vs. | : | |
| | : | COMPLAINT |
| SEALED | : | |
| | : | JURY TRIAL DEMANDED |
| Defendants. | : | |
| | : | **DO NOT PLACE IN PRESS BOX** |

1

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF WEST VIRGINIA

| | |
|---|---|
| UNITED STATES OF AMERICA<br>*ex rel.* LIESA KYER,<br><br>Plaintiff-Relator,<br><br>vs.<br><br>THOMAS HEALTH SYSTEM, INC.,<br>HERBERT J. THOMAS MEMORIAL<br>HOSPITAL ASSOCIATION (d/b/a/<br>THOMAS MEMORIAL HOSPITAL),<br>CHARLESTON HOSPITAL, INC. (d/b/a<br>ST. FRANCIS HOSPITAL),<br>THS PHYSICIANS PARTNERS, INC., and<br>BRIAN ULERY,<br><br>Defendants. | ) **FILED UNDER SEAL PURSUANT TO**<br>) **31 U.S.C. § 3730(b)(2)**<br>)<br>) CIVIL ACTION NO. 2:20 – 0732<br>)<br>) **DO NOT PLACE IN PRESS BOX** |

### COMPLAINT AND DEMAND FOR JURY TRIAL

### I.    INTRODUCTION

1.    Liesa Kyer ("Relator"), on her own behalf and in the name of the United States of America, brings this civil action against Defendants Thomas Health System, Inc., Herbert J. Thomas Memorial Hospital Association (d/b/a/ Thomas Memorial Hospital), Charleston Hospital, Inc. (d/b/a/ St. Francis Hospital), THS Physicians Partners, Inc., and Brian Ulery under the *qui tam* provisions of the False Claims Act, 31 U.S.C. §§ 3729-33 ("FCA"), seeking treble damages, civil penalties, and other relief arising from Defendants' violations of the Stark Law, 42 U.S.C. § 1395nn, and the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b) (prohibited conduct and criminal penalties) and 42 U.S.C. § 1320a-7a(a)(7) (civil penalties).

2.      Since at least 2012, Defendants engaged in a successful scheme to pay improper compensation to certain employed physicians to reward or induce them to refer patients, including beneficiaries of federal health care programs, to Thomas Memorial and St. Francis hospitals.

3.      Defendants paid certain employed physicians far in excess of the value of their personal services, while the hospitals received substantial profits from inpatient and outpatient referrals by these physicians. The compensation exceeded the fair market value of their personal services and was based on the physicians' ability to generate referrals for the hospitals.

4.      As detailed below, Defendants knowingly violated federal Stark and anti-kickback laws and knowingly submitted or caused the submission of thousands of false claims to federal health care programs, which claims arose through tainted referrals from employed physicians receiving excessive payments from the hospitals.

## II.      PARTIES AND ENTITIES

### A.      Relator

5.      Relator Liesa Kyer has an extensive background in nursing, including working as a nurse at Thomas Memorial for 13 years.

6.      Relator brings this matter on behalf of the United States under the FCA. The United States acts through its various agencies and departments, including the Department of Health and Human Services ("HHS"), which administers Medicare through the Centers for Medicare and Medicaid Services ("CMS"); the Department of Defense, which administers TRICARE through the Defense Health Agency; and other relevant government payors.

### B.      Defendants

7.      Thomas Health System, Inc. ("Thomas Health") is a 501(c)(3) not-for-profit entity that controls the three other entity defendants described below. With a total of 383 beds, Thomas

Health has approximately 1,800 employees and an estimated 450 physicians, making it the 17th largest private employer in West Virginia. Thomas Health is the sole member of both defendant Herbert J. Thomas Memorial Hospital Association, d/b/a/ Thomas Memorial Hospital ("Thomas Memorial") and defendant Charleston Hospital, Inc., d/b/a/ St. Francis Hospital ("St. Francis"). As the sole member of those entities, Thomas Health elects their respective board of directors and has reserved all corporate powers, except for items specifically listed in each organization's articles of incorporation. As detailed below, the same persons hold the same top three executive officer positions for Thomas Health and for the three affiliated entity defendants described below.

8.     Herbert J. Thomas Memorial Hospital Association (d/b/a/ Thomas Memorial Hospital) ("Thomas Memorial") is a 501(c)(3) not-for-profit entity located at 4605 MacCorkle Avenue, SW, South Charleston, West Virginia. Established in December 1946, Thomas Memorial purchased defendant St. Francis in 2007 and created defendant Thomas Health as an umbrella company to oversee both facilities.[1]

9.     Charleston Hospital, Inc., d/b/a/ St. Francis Hospital ("St. Francis") is a not-for-profit company located at 333 Laidley Street, Charleston, West Virginia. St. Francis was purchased by Thomas Memorial in 2007 and is overseen by Thomas Health.[2]

10.     THS Physicians Partners, Inc. ("THSP") is a West Virginia entity formed on January 27, 2012, with its principle place of business at 4605 MacCorkle Avenue, SW, South Charleston, West Virginia. THSP is a multi-specialty physician group and wholly-owned

---

[1] https://www.wvencyclopedia.org/articles/718#:~:text=Thomas%20Memorial%20Hospital%20in%20South,of%20Honor%20for%20his%20heroism. (last visited Nov. 6, 2020).
[2] *Id.*; https://www.wvencyclopedia.org/articles/154#:~:text=Francis%20Hospital%20in%20Charleston%20was,Sacred%20Heart%20Church%20in%20Charleston. (last visited Nov. 6, 2020).

subsidiary of Thomas Health that consists of physicians and mid-level providers in the areas of family medicine, internal medicine, general and oncological surgery, urology, and psychiatry.

11.     Brian Ulery is an individual who resides in Charleston, West Virginia, and who for the past several years has served as the Chief Operating Officer/Executive Vice President of all four corporate defendants, *i.e.*, Thomas Health, Thomas Memorial, St. Francis, and THSP.

## III.    JURISDICTION AND VENUE

12.     The Court has subject matter jurisdiction over the FCA claims alleged in this complaint under 28 U.S.C. § 1331 (federal question) and the FCA itself at 31 U.S.C. § 3732(a).

13.     The Court has personal jurisdiction over each defendant pursuant to 31 U.S.C. § 3732(a) because each defendant can be found, resides, or transacts business in this district.

14.     Venue is proper in this district pursuant to 31 U.S.C. § 3732(a) and 28 U.S.C. § 1391 because each defendant can be found, resides, and transacts business in this district; an act proscribed by 31 U.S.C. § 3729 occurred within this district; and a substantial part of the events or omissions giving rise to the claims alleged in this complaint occurred in this district.

15.     Relator is aware of no subject matter or other jurisdictional bars set forth in the FCA that would be applicable to this action.

16.     Relator is the "original source" of the allegations in this complaint as that term is used in the FCA. During her tenure at Thomas Memorial, Relator acquired material, direct, independent, and non-public knowledge of the information on which the allegations in this complaint are based, and she voluntarily and in good faith disclosed this information to the United States Attorney's Office for the Southern District of West Virginia prior to filing this complaint.

## IV.  THE FALSE CLAIMS ACT

17.  The FCA makes it unlawful for any person to submit, directly or indirectly, false or fraudulent claims for payment to the Government. *See* 31 U.S.C. §§ 3729-33. Relator alleges liability primarily under four of the FCA's seven liability provisions.

18.  First, the FCA's "presentment" provision, 31 U.S.C. § 3729(a)(1)(A), imposes liability when a defendant "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval."

19.  Second, the FCA's "false records or statements" provision, 31 U.S.C. § 3729(a)(1)(B), imposes liability when a defendant "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim."

20.  Third, the FCA's "conspiracy" provision, 31 U.S.C. § 3729(a)(1)(C), imposes liability when a defendant "conspires to commit a violation of" the FCA's other six provisions: subparagraphs (A), (B), (D), (E), (F), or (G).

21.  Fourth, the FCA's "reverse false claims" provision, 31 U.S.C. § 3729(a)(1)(G), imposes liability when a defendant "knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government."

22.  The FCA defines the terms "knowing" and "knowingly" as meaning that "a person with respect to information—(i) has actual knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity of the information" or (iii) acts in reckless disregard of the truth or falsity of the information." 31 U.S.C. § 3729 (b)(1). Proof of specific intent to defraud is not required. *Id.*

23.     As relevant to this complaint, the FCA defines the term "claim" as follows:

any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that—(i) is presented to an officer employee, or agent of the United States; or (ii) is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest and if the United States Government (I) provides or has provided any portion of the money or property requested or demanded; or (II) will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded[.]

31 U.S.C. § 3729(b)(2).

24.     The term "obligation" under the FCA "means an established duty, whether or not fixed, arising from an express or implied contractual, grantor-grantee, or licensor-licensee relationship, from a fee-based or similar relationship, from statute or regulation, or from the retention of any overpayment." 31 U.S.C. § 3729(b)(3).

25.     The FCA further states that "the term 'material' means having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property."[3] 31 U.S.C. § 3729(b)(4).

## V.     FEDERAL HEALTH CARE PROGRAMS

### A.     Medicare and Medicaid

#### 1.  Medicare

26.     Medicare covers the costs of certain medical services for persons aged 65 years or older and those with disabilities. Medicare is divided into four parts, two of which are relevant here. Part A authorizes payment for institutional care, including hospital, skilled, nursing facility,

---

[3] The Supreme Court reaffirmed the use of this objective natural tendency materiality test—even as to subsection (a)(1)(A), which does not explicitly use the term—and described a holistic approach to analyzing it. *Universal Health Services, Inc. v. United States ex rel. Escobar*, 136 S. Ct. 1989, 1996 (2016).

and home health care. *See* 42 U.S.C. §§ 1395c-1395i-4. Part B authorizes payment for outpatient health care expenses, including physician fees. *See* 42 U.S.C. §§ 1395-1395w-4.

27.    HHS is responsible for the overall administration and supervision of the Medicare program, the direct administration of which is CMS's responsibility. CMS makes Medicare payments retrospectively to health care providers that are enrolled to participate in Medicare and that submit claims for payment on behalf of Medicare beneficiaries.

### 2. Medicaid

28.    Medicaid is a joint federal-state program that provides health care benefits primarily for low-income individuals and families. Authorized under Title XIX of the Social Security Act, Medicaid is administered by each state in compliance with federal requirements under the Medicaid statute and regulations. *See* 66 Fed. Reg. 857 ("The States operate Medicaid programs in accordance with Federal laws and regulations and with a State plan that we approve."). To qualify for federal funding under Medicaid, state programs must cover hospital and physician services at a minimum. 42 U.S.C. § 1396a(10)(A), 42 U.S.C. § 1396d(a)(1)(2), (5).

29.    Federal funding of state Medicaid programs is called federal financial participation ("FFP"). The amount covered by federal funding is generally based on a formula reflecting the state's per capita income and ranges from 50% to 83% of the dollars spent by the state to provide Medicaid services. The federal matching rate for the West Virginia Medicaid program is approximately 75% percent. The Medicaid program in West Virginia is administered by the Bureau for Medical Services in the Department of Health and Human Resources.

### 3.  Medicare and Medicaid Program Integrity Provisions

30.     A person or entity that receives an overpayment of Medicare or Medicaid funds must report and return the overpayment within 60 days of the date on which the overpayment was identified. 42 U.S.C. § 1320a–7k(d)(1)–(2).

31.     An "overpayment" is defined as "any funds that a person receives or retains under [the Medicare and Medicaid statutes] to which the person, after applicable reconciliation, is not entitled." 42 U.S.C. § 1320a–7k(d)(4)(B).

### B.    TRICARE

32.     Thomas Memorial, St. Francis, and THSP serviced patients whose bills were submitted to TRICARE, a federally funded program that provides hospital services and other medical benefits, to certain relatives of active duty, deceased, and retired service members or reservists, as well as to retirees. TRICARE also may provide hospital services for active duty patients at non-military facilities. 10 U.S.C. §§ 1071-1110; 32 C.F.R. § 199.4(a).

33.     TRICARE payments for hospital services is based, in part, on an entity's Medicare cost report. 32 C.F.R. § 199.14. In addition to individual patient costs, which use the same payment system as Medicare, TRICARE pays hospitals for capital costs, direct medical education costs, and outlier cases. *Id.*

## VI.    STARK AND ANTI-KICKBACK STATUTES

### A.    The Stark Law Prohibits Financial Relationships with Designated Health Services Providers.

34.     Recognizing the conflict of interest present when a physician refers a patient to a medical facility in which he or she has a financial relationship, Congress enacted the Physician Self-Referral Law, commonly referred to as the Stark Law. 42 U.S.C. § 1395nn. Designed to eliminate monetary influences from physician referrals, the Stark Law prohibits providers from

9

submitting, and the United States from paying, claims for designated health services ("DHS") prescribed by physicians who have a prohibited financial relationship with the DHS provider.[4]

35.    The Stark Law applies to claims submitted to and paid by Medicare and Medicaid (and federal payment of FFP to the States under the Medicaid program).

36.    The Stark Law applies to the following DHSs: (A) clinical laboratory services; (B) physical therapy services; (C) occupational therapy services; (D) radiology services, including magnetic resonance imaging, computerized axial tomography scans, and ultrasound services; (E) radiation therapy services and supplies; (F) durable medical equipment and supplies; (G) parenteral and enteral nutrients, equipment, and supplies; (H) prosthetics, orthotics, and prosthetic devices and supplies; (I) home health services; (J) outpatient prescription drugs; (K) inpatient and outpatient hospital services; and (L) outpatient speech-language pathology services. *See* 42 U.S.C. § 1395nn(h)(6).

37.    A prohibited financial relationship includes "compensation arrangements" in which an entity providing DHS (including hospitals) directly or indirectly pays any "remuneration" to a referring physician in exchange for referrals. 42 U.S.C. § 1395nn(a)(1), (a)(2)(B), (h)(l)(A); 42 C.F.R. § 411.354(c). "The term 'remuneration' includes any remuneration, directly or indirectly, overtly or covertly, in cash or in kind." 42 U.S.C. § 1395nn(h)(1)(B).

38.    The Stark Law provides that if a physician has a financial relationship with a hospital or entity, then:

> (A) The physician may not make a referral to the entity for the furnishing of designated health services for which payment otherwise may be made under this subchapter, and

---

[4] The Stark Law "was enacted to address over-utilization, anti-competitive behavior, and other abuses of health care services that occur when physicians have financial relationships with certain ancillary service entities to which they refer Medicare or Medicaid patients." 69 Fed. Reg. 16124 (March 26, 2004).

(B) the entity may not present or cause to be presented a claim under this subchapter or bill to any individual, third party payor, or other entity for designated health services furnished pursuant to a referral prohibited under subparagraph (A).

42 U.S.C. § 1395nn(a)(1).

39.    The Stark Law prohibits Medicare and Medicaid from paying claims submitted in violation of the Stark Law: "No payment may be made under this subchapter for a designated health service which is provided in violation of subsection (a)(1) of this section." 42 U.S.C. §1395nn(g)(1).

40.    When a hospital violates the Stark Law and collects payment of prohibited claims, it "must refund all collected amounts on a timely basis." 42 C.F.R. § 411.353.

### 1.    The Stark Law Broadly Defines "Referral."

41.    The Stark Law defines "referral" as "the request or establishment of a plan of care by a physician which includes the provision of designated health services." 42 U.S.C. § 1395nn(h)(5)(A).

42.    A "referral" includes "a request by a physician that includes the provision of any designated health service for which payment may be made under Medicare, the establishment of a plan of care by a physician that includes the provision of such a designated health service, or the certifying or recertifying of the need for such a designated health service . . ." 42 C.F.R § 411.351. A referral also occurs when a physician "directs another person or entity to make a referral or who controls referrals made to another person or entity." *Id.*

43.    While the Stark Law contains broad prohibitions on financial relationships, it also identifies a number of exceptions. If a Stark Law violation is established, the defendant has the burden of showing that one of the exceptions apply.

44.     One exception is the existence of a "bona fide employment relationship" between the physician and the employing entity. This exception is commonly invoked when a hospital hires as "employees" physicians who refer Medicare and Medicaid patients to the hospital for DHS.

**2.      The "Bona Fide Employment Relationship" Exception to the Stark Law Must Satisfy Four Primary Requirements.**

45.     A "bona fide employment relationship" consists of four requirements: (1) the "employment is for identifiable services," (2) "the amount of the remuneration under the employment . . . is consistent with the fair market value of the services" personally provided by the physician, (3) the remuneration "is not determined in a manner that takes into account (directly or indirectly) the volume or value of any referrals by the referring physician," and (4) "the remuneration is provided pursuant to an agreement which would be commercially reasonable even if no referrals were made to the employer." 42 U.S.C. § 1395nn(e)(2).

46.     The first requirement is self-explanatory: it must be clear what services are being provided as a result of the financial relationship.

47.     The second requirement limits compensation to fair market value defined as "the value in arm's length transactions, consistent with the general market value . . ." 42 U.S.C. § 1395nn(h)(3). This requirement contemplates payment to physicians based on their actual and personal labor. 66 Fed. Reg. 876. Accordingly, a physician's productivity "refers to the quantity and intensity of a physician's own work, but does not include the physician's fruitfulness in generating DHS performed by others . . ." *Id.* (emphasis added). Thus, the test is whether the compensation reflects "fair market value for the work or service performed . . . not inflated to compensate for the physician's ability to generate other revenues." 66 Fed. Reg. at 877.

48.    The third requirement prohibits compensation "that takes into account (directly or indirectly) the volume or value of any referrals by the referring physician." 42 U.S.C. § 1395nn(e)(2). If physicians are paid "per service" or "per time period," the "per service" amount "must reflect fair market value at inception not taking into account the volume or value of referrals and must not change over the term of the contract based on the volume or value of DHS referrals . . ." 66 Fed. Reg. 878.

49.    The fourth requirement reflected in 42 U.S.C. § 1395nn(e)(2)—that a physician's compensation must be "commercially reasonable even if no referrals were made to the employer"— reflects that fair market value under the Stark Law is not achieved simply by the fact the parties negotiated the employment relationship.

50.    To provide "commercially reasonable" compensation means that the "arrangement would make commercial sense if entered into by a reasonable entity of similar type and size and a reasonable physician (or family member or group practice) of similar scope and specialty, *even if there were no potential DHS referrals*." 69 Fed. Reg. 16093 (emphasis added).

51.    The centrality of excluding the ability to generate referrals from the negotiation of fair market value is memorialized and made clear in the federal regulation defining the term:

> Fair market value means the value in arm's-length transactions, consistent with the general market value. 'General market value' means the price that an asset would bring as the result of bona fide bargaining between well-informed buyers and sellers **who are not otherwise in a position to generate business for the other party**, or the compensation that would be included in a service agreement as the result of bona fide bargaining between well-informed parties to the agreement **who are not otherwise in a position to generate business for the other party**, on the date of acquisition of the asset or at the time of the service agreement.

42 C.F.R. § 411.351 (emphasis added).

**B.      The Anti-Kickback Statute Prohibits Paying for Referrals.**

52.     When a federal health care program provides payment, the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b) ("AKS"), mandates paying individual health care providers based on the fair market value of their services without taking into account whether and to what extent the individual provider refers patients for services.

53.     The AKS achieves the above end by prohibiting an individual or entity from offering or paying "any remuneration . . . directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person to . . . refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program." 42 U.S.C. § 1320a-7b(b)(2).

54.     The AKS also imposes liability on those who solicit or receive remuneration in exchange for referring program-related business. 42 U.S.C. § 1320a-7b(b)(1).

55.     Because the AKS prohibits offering or soliciting illegal remuneration, liability may occur without proof of payment.

56.     Congress passed the AKS out of concern that providing financial incentives to physicians based on volume of referrals would result in referrals that are medically unnecessary, more costly than necessary, poor quality, or even harmful to a vulnerable patient population. This concern was affirmed by studies showing that physicians were influenced by financial incentives regardless of their intent to act in good faith.

57.     Because monitoring every case for unnecessary procedures would be an impossible task, and because of the importance of preventing improper influence in medical decisions, Congress enacted the AKS as a *per se* prohibition against the payment of kickbacks in any form. The AKS does not require proof of overutilization or poor quality of care. "If any one purpose of

remuneration is to induce or reward referrals of Federal health care program business, the [AKS] statute is violated." 66 Fed. Reg. 919.

58.    In 2010, Congress amended the AKS to state that any Medicare claim "that includes items or services resulting from a violation of [the AKS] constitutes a false or fraudulent claim for purposes of [the FCA]." 42 U.S.C. § 1320a-7b(g). Accordingly, compliance with the AKS is material to CMS's decision to pay a Medicare claim, and the knowing submission of an AKS-tainted claim violates the FCA.

59.    The AKS allows for some "safe harbors," exempting certain practices from liability. 42 U.S.C. § 1320a-7b(b)(3). HHS has promulgated regulations for these safe harbors, identifying various circumstances when a financial relationship between a provider and a referral source is acceptable under the AKS. 42 C.F.R. § 1001.952.

60.    One of those safe harbors exempts payments to an individual who is working under a "personal services and management contract." To qualify for this safe harbor, the agreement between an individual and another individual must be "set in advance, [must be] . . . consistent with fair market value in arms-length transactions and [must] . . . not [be] determined in a manner that takes into account the volume or value of any referrals or business otherwise generated between the parties for which payment may be made in whole or in part under Medicare or a State health care program." 42 C.F.R. § 1001.952(d).

61.    A violation of the AKS may subject the defendant to exclusion from participation in federal health care programs, civil monetary penalties of $100,000 per violation, and three times the amount of remuneration paid, regardless of whether any part of the remuneration is for a legitimate purpose. 42 U.S.C. § 1320a-7a(a)(7) (civil penalties for violation of the acts proscribed by 42 U.S.C. § 1320a-7b(b)).

62.    The Stark Law and the AKS are not mutually exclusive. They are characterized as "complementary and although overlapping in some aspects, not redundant." 66 Fed. Reg. 863. "Congress only intended [the Stark laws] to establish a minimum threshold for acceptable financial relationships, and that potentially abusive financial relationships that may be permitted under Section 1877 of the Act could still be addressed through other statutes that address health care fraud and abuse, including the antikickback statute (Section 1128B(b) of the Act)." 66 Fed. Reg. 860.

## VII.    DEFENDANTS' FCA VIOLATIONS

### A.    Thomas Health, Thomas Memorial, St. Francis, and THSP Are Integrally Connected.

63.    Thomas Health System, Inc., is a non-profit corporation established in late 2006 initially to manage the operations of Thomas Memorial Hospital and St. Francis Hospital.

64.    Thomas Memorial and St. Francis hospitals are wholly-owned and controlled subsidiaries of Thomas Health System. Thomas Memorial is a 178-bed general acute care hospital, and St. Francis is a 155-bed general acute care hospital. Both hospitals are enrolled in Medicare and Medicaid and are known to treat Medicare and Medicaid patients.

65.    THSP, incorporated as a subsidiary of Thomas Health in January 2012, is a group of physicians and mid-level providers in many different specialties that provide medical services to Thomas Memorial and St. Francis. The NPI for THS Physician Partners, Inc., is 1871866806. It is enrolled in both Medicare and Medicaid.

66.     Current Medicare records indicate that there are 71 clinicians affiliated with THS Physician Partners, Inc.[5] These clinicians' names typically appear in the online directory of physicians for Thomas Memorial[6] and St. Francis,[7] which link to the identical webpages when clicking on "Find a Physician" and "Services." The two hospital websites largely mirror each other and are branded with the Thomas Health masthead.

67.     Thomas Health, Thomas Memorial, and THSP all share a common address at 4605 MacCorkle Avenue SW, South Charleston, West Virginia, an address associated primarily with Thomas Memorial.

68.     This unity of executive officers is also evident on Thomas Health's website,[8] where its identification of "Thomas Health Administration"  includes the following:

> President and CEO: Daniel Lauffer
> Executive Vice President and COO: Brian Ulery
> CFO and Senior Vice President of Finance: Timothy Skeldon

The same persons are identified in the same roles as "Administration" on the website for Thomas Memorial,[9] which page is also the landing page for "Administration" from the St. Francis website.

69.     THSP does not have a website, but a search for "THS Physician Partners, Inc." brings up a website for Thomas Health System Physician Partners Orthoclinic.[10]

---

[5] https://www.medicare.gov/care-compare/details/group-practice/9537316393?id=54b60b88-c977-49f3-bb07-4a75ba3bd65d&city=South%20Charleston&state=WV (last visited Nov. 6, 2020).

[6] http://thomaswv.org/ through the tabs "Find a Doctor" and "Services" (last visited Nov. 6, 2020).

[7] http://thomaswv.org/sfhclinics through the tabs "Find a Doctor" and "Services" (last visited Nov. 6, 2020).

[8] https://thomashealth.org/thomas-health-administration/ (last visited Nov. 6, 2020).

[9] http://thomaswv.org/admin (last visited Nov. 6, 2020).

[10] https://www.orthoclinic-thspp.com/thomas-health-system-physician-partners-orthoclinic-physician-partners-orthoclinic-west-virginia.html (last visited Nov. 6, 2020).

70.    Nonprofit corporations such as Thomas Health, Thomas Memorial, St. Francis, and THSP are required to file an IRS Form 990 annually. This form gives the IRS an overview of the nonprofit's activities and governance as well as detailed financial information. Among other things, the Form 990 requires the nonprofit to list the names and salaries of its directors, trustees, officers, and other key employees.

71.    The fiscal year ("FY") for Thomas Health, Thomas Memorial, St. Francis, and THSP runs from October 1 of the starting year through September 30 of the following year. Accordingly, FY 2016 would run from October 1, 2016 through September 30, 2017. Accordingly, and for example, the entities used IRS Form 990 for 2016 for the time period from October 1, 2016 through September 30, 2017.[11] However, other documents use the descriptive "Fiscal Year Ending" (FYE 9/30/20[XX]) when reporting financial data. Hence, the time period October 1, 2015 through September 30, 2016 could be identified as both or either FY 2015 or FYE 9/30/2016.

72.    As demonstrated in the following chart, the Form 990 filings for all four entities show that the same persons typically hold the same top three officer positions across all four entities and have also held board positions.

---

[11] For purposes of this complaint, Relator identifies the Form 990s by the year indicated on the form itself.

| | Thomas Health System, Inc | Thomas Mem. Hospital | St. Francis Hospital. | THS Physician Partners, Inc |
|---|---|---|---|---|
| CEO/President | Daniel Lauffer (990 FY 2017, 2016, 2015, 2014) | Daniel Lauffer (990 FY 2017, 2016, 2015, 2014) Stephen Dexter (990 FY 2014, 2013, 2012) | Daniel Lauffer (990 FY 2017, 2016, 2015, 2014, 2013, 2012, 2011) | |
| COO/Sr. VP/VP | Brian Ulery (990 FY 2017, 2016, 2015, 2014) [12] | Brian Ulery (990 FY 2017, 2016, 2015, 2014, 2013) | Brian Ulery (990 FY 2017, 2016, 2015, 2014) | Nobody listed in FY 2017 Form 990 Brian Ulery (990 FY 2016, 2015, 2014) |
| CFO/ Sr. VP Finance/VP Finance | Timothy Skeldon 7/24/17--_____ (990 FY 2017) Renee Cross _____-- 7/14/17 (990 FY2017, 2016, 2015, 2014) Charles Covert (FY 990 2013) | Timothy Skeldon 7/24/17--_____ (990 FY 2017) Renee Cross _____-- 7/14/17 (990 FY 2017, 2016, 2015, 2014) Charles Covert (990 FY 2014, 2013, 2012) | Timothy Skeldon 7/24/17--_____ (990 FY 2017) Renee Cross _____-- 7/14/17 (990 FY 2017, 2016, 2015, 2014, 2013, 2012, 2011) | Timothy Skeldon 7/24/17--_____ (990 FY 2017) Renee Cross _____-- 7/14/17 (990 FY2017, 2016, 2015, 2014) Charles Covert (990 FY 2013, 2012) |
| Trustee/Director Positions held by Key Officers | | Daniel Lauffer (990 FY 2013, 2012) | Brian Ulery (990 FY 2017, 2016, 2015) | Daniel Lauffer (990 FY 2017, 2016, 2015, 2014) Stephen Dexter (990 FY 2013 2012) |
| Executive Director | | | | Louis Roe (990 FY 2017, 2016, 2015, 2014, 2013) David Roe (990 FY 2013, 2012) |
| Interim Executive Director | | | | Brian Ulery (990 FY 2013, 2012) |

73.    In short, during the relevant period of time, all four entities have been simultaneously controlled by defendant Brian Ulery as COO, as well as the persons variously holding the CEO and CFO positions.

74.    The Form 990s also indicate that Ulery's compensation was paid by Thomas Memorial in FYs 2013 through 2017.

_____

[12] As noted in the Form 990s of Charleston Hospital Inc. d/b/a St. Francis Hospital. The Form 990s of Thomas Health System Inc. routinely list board members but only one or two officers.

**B.    Defendants Buy Up Private Practices that Provide Referrals to Thomas Memorial.**

75.    Relator Liesa Kyer worked at Thomas Memorial for 13 years, from 1996 to 2009, first as an aide and then as a nurse. She has Masters degrees in both nursing and healthcare administration and is an Associate Professor of Healthcare Management at BridgeValley Community and Technical College, where she has taught since 2009.

76.    Relator is married to Dr. Paul Dean Kyer who opened a general surgery private practice (Dean Kyer M.D., P.L.L.C.) in late 2000. Relator manages the business side of her husband's practice.

77.    Since opening his own practice, Dr. Kyer has maintained privileges at Thomas Memorial and two other hospitals.

78.    Thomas Memorial hired Ulery as Vice President of Physician Practices in 2013.

79.    Not long after Ulery's appointment, Relator became aware of talk among local doctors who attended a meeting of the Kanawha Valley Medical Associates that Ulery had made comments about buying up private practices in the area, stating words to the effect, "if we own them, we own their referrals."

80.    Relator then became aware that Thomas Memorial was indeed buying up private practices, which then became a part of THSP.

81.    One physician who was an early hire left THSP after a year or two because he thought THSP was operating so much in the hole that the business could not be sustained.

82.    About three years ago, Dr. Kyer had a conversation with Thomas Memorial CEO Dan Lauffer about whether Dr. Kyer would continue taking calls for the Thomas Memorial emergency room, for which he was not being paid. Lauffer told him that if he wanted to be paid, the hospital would hire him, too. Dr. Kyer did not pursue the offer.

83.     After Dr. Kyer declined to sell his practice, Relator further learned through casual conversations with physicians, surgeons, and other Thomas Memorial staff that Ulery had boasted at board meetings words to the effect that he had bought up so many practices in the area that "it's okay if we don't own every private practice, because we are going to own all of their referrals."

84.     Relator has observed the effect of Ulery's boasts on her husband's general surgery practice. One family medicine physician, Dr. Paul Kuryla, had previously referred many patients to Dr. Kyer, on average about six to ten a month. When Thomas Memorial purchased Dr. Kuryla's practice and became a part of THSP, his referrals to Dr. Kyer drastically declined after about a year. Now, Dr. Kyer receives referrals of only a few of Dr. Kuryla's patients, and they are typically persons he has treated in the past.

85.     Within the last two years, Dr. Kyer's office received a notification from Thomas Memorial that the hospital had its own referral center that disseminates referrals. Accordingly, when the rare referral came to Dr. Kyer from Thomas Memorial, it was made on the Thomas Memorial referral center form. This made it clear that Thomas Memorial was controlling and tracking external referrals.

86.     Suspicious of Ulery's intentions, Relator further discovered that Ulery had previously been involved in an FCA case involving Stark Law violations at Broward Health in Broward County, Florida. The case alleged that Broward Health violated the FCA by engaging in improper financial relationships with referring physicians. According to the complaint, after a doctor was hired at Broward, the hospital tracked referrals in secret "Contribution Margin Reports" and projected the value and volume of their anticipated referrals to calculate physician compensation.

87.    The complaint alleged that evidence of Stark Law violations was "deliberately concealed" from the public, even though the hospital district is subject to Florida's public records laws. Ulery was alleged to have "touted" Contribution Margin Reports in private meetings and to have confirmed they were "concealed and 'not listed in our financials.'"

88.    Ulery resigned as Broward Health's Vice President of Physician Services and Facilities Operations in 2011, just four months after HHS agents served a subpoena on Broward Health seeking records of its business dealings with 27 physicians, including information about compensation, hospital admissions, and referrals dating back to 2000.

89.    Ulery joined Thomas Health in about September 2013, where he advocated implementation of a business model similar to that of Broward Health.

90.    The FCA case against Broward Health settled in 2015 for $69.5 million.

**C.    Relator Discovers Evidence of Stark Law and AKS Violations.**

**1.    Physician Overcompensation**

91.    Having learned about Ulery's history at Broward Health, and having heard his boasting about buying practices and "owning" referrals in his position at Thomas Health, Relator was concerned that Ulery would engage in similar illegal conduct in West Virginia.

92.    Those concerns became a reality when Relator had occasion to review copies of IRS Form 990s filed by the Thomas Health entities.

93.    Besides the information identified above, the Form 990s also require the filing entity to identify the names and salaries of the five current highest compensated *employees* who are not officers, directors, trustees, or other key employees. Accordingly, each of the THSP Form 990s identifies five physician employees and their compensation. Schedule J to the Form 990 breaks compensation down into base compensation, bonus and incentive compensation, retirement

and other deferred compensation, and non-taxable benefits. Relator had access to Schedule J's for FY 2014, 2015, 2016, and 2017. The 2014 and 2015 Form 990s indicated "0" bonus and incentive compensation for the highest paid employees. Subsequent years (2016 and 2017) indicate that the highest paid employees received base compensation, plus a bonus.

94.     The salaries Relator observed on the THSP Form 990s were shocking—based on her knowledge of the earnings that would be expected for physicians in that area, the amounts were exceedingly high.

95.     The tables below, derived from the THSP IRS Form 990s, show that several THS physicians who service government-pay patients have salaries well in excess of the average compensation for their specialties as provided in Medscape Physician Compensation Reports.[13] Schedule J to the Form 990s breaks down the top employee compensation into base compensation, bonus and incentive compensation, retirement and other deferred compensation, and nontaxable benefits. The tables below contain compensation amounts from the Form 990 Schedule J for the applicable fiscal year. The last two categories, retirement and other deferred compensation and nontaxable benefits, are combined as "Other Compensation" in the tables.

96.     **Dr. Narender Jogenpally, M.D. – Hematology/Oncology Specialist:** Dr. Jogenpally is currently listed in Thomas Memorial's online directory and is affiliated with THSP. His compensation as one of THSP's five highest paid employees is reported on THSP Form 990s as follows:

---

[13] Medscape performs an annual Physician Compensation Survey that is publicly available and based on a survey of thousands of physicians (more than 17,000 in 2020). *See* https://www. medscape.com/sites/public/physician-comp/2020#:~:text=The%20Medscape%20Physician%20 Compensation%20Report,tenth%20year%20in%20a%20row (last visited Nov. 6, 2020)

| Physician | Fiscal Year | Base + Bonus Compensation | Other Compensation | Total | Medscape Average for Oncology Specialists |
|---|---|---|---|---|---|
| Jogenpally | 2017 (10/1/2017-9/30/2018) | $905,018 (Base: $651,670; Bonus: $253,348) | $38,487 | **$943,505** | $363,000 (2018) |
| Jogenpally | 2016 (10/1/2016-9/30/2017) | $763,190 (Base: $652,775; Bonus: $110,415) | $34,240 | **$797,430** | $330,000 (2017)  $329,000 (2016) |
| Jogenpally | 2015 (10/1/2015-9/30/2016) | Base: $543,952 | $29,678 | **$573,630** | $302,000 (2015) |

97.    Based on Medscape's Physician Compensation Reports, Dr. Jogenpally's compensation ranged from about $276,000 to more than $576,000 *above* average during the period from FY 2015 through FY 2017.

98.    Dr. Jogenpally is enrolled in Medicare and Medicaid. His approximate Medicare reimbursements were as follows:

| Medicare Reimbursements | Jogenpally |
|---|---|
| 2012 | $1,044,274.70 |
| 2013 | $1,027,585.53 |
| 2014 | $940,976.05 |
| 2015 | $250,898.99 |
| 2016 | $140,788.57 |
| 2017 | $128,182.85 |